Next case is 2061365. In Ray Martin Gleave and Shidaiki Miyake. Ms. Larson. Good morning, Your Honors. My name is Marina Larson. I'm here on behalf of the Inventors and the Assembly of the University of British Columbia. This is a simple case. It has one issue. We've pared it down so that there's really only one issue by the time it gets here. It has to do with what is fast becoming my least favorite subject, written description. I'm seeing written description in a whole lot of office actions. And I find that if I apply the same standards that the patent office is doing right now, when I'm writing opinion letters, I can nail almost every patent out there on written description. I think it needs some clarification, and I think this is a good case in which that could happen. The only claims at issue here are to a method of treatment. The inventors found that when you use a target protein, certain beneficial results are there. There was no prior art that is before you. The issue is how much scope should the inventor of a therapeutic method be able to get. We disclosed numerous examples of compounds that work to inhibit this protein, which is IGFBP5. The protein was already known when we came around. It just didn't have any reason to be a therapeutic target before the inventors. We're different from the Rochester case because we do have specific compounds. Why are we using antisense? Because that's what my inventors know how to use. If they waited until they hired somebody or got some other department at the university to develop small chemical compounds or antibodies or anything else that might also accomplish this function, it would be contrary to both the policy of the patent system... What did you invent? They discovered... I look at invention in two steps. First, we have a discovery in the scientific area in many cases, followed by embodying it into an invention. The discovery is that the protein here is a valid therapeutic target for the specific circumstances and conditions that are recited in the claims. The invention, then, is the conversion of that into calling it a method of treatment. If we are limited to... The patent office says we should be happy with this subgenus, that they gave us all oligonucleotides. But in fact, anyone who comes along, they didn't think the invention was limited to oligonucleotides. They thought the method could use other things, but the oligonucleotides... How do we know that they didn't think it was limited to the eight antisense examples that we find in the patent? In part because the claims as originally drafted said a method of treatment using a composition. And just, it's realistic to assume. We know that when we come along, we're not... If we want prompt disclosure, if we want our inventors to be able to publish... Let me go back to the question. What did you invent? A method of treating, in the first instance, hormone-dependent cancers, such as prostate and breast cancer, that using a combination of an androgen withdrawal... But you're just reciting the claim to me. Tell me, what is the thing that you added to the prior art? Didn't you recognize a specific... That the IGFBPs are an important factor? Yes, absolutely. In cancer growth? Yes, absolutely. Was that in addition to the prior art? Yes, it was. The prior art did not know that inhibiting... was therapeutically beneficial. Androgen withdrawal is a terrible consequence in both breast and prostate cancer because all of a sudden all your good results go out the window. But all the bad side effects of the therapy that led to... that created androgen withdrawal are still there. And so the prior art did not have any purpose for IGFBP as a therapeutic. And so the result is that this is what we want to do. And I sense it's what our inventors know how to do. But if someone comes along and now, having understood our contribution to the art, and makes a small molecule, they haven't yet, but we assume they could, if we don't have this claim they will go out and use their small molecule, which is probably patentable, and probably a wonderful invention, and they'll be able to say, ha ha, we get to use it in your method. And I think that's wrong. And I think we have possession of that invention at the broader scope. Ms. Larson, let me ask you a question. What if we agree with you and reverse the patent office on written description? There was also a rejection on enablement, which was not appealed. It wasn't decided, Your Honor.  That's correct. But the examiner did reject the application on the basis of enablement. Would you now go back and re-argue enablement? I don't know what the Board would do. In many cases, written description and enablement kind of go hand in hand. If I went back to re-argue enablement and had to argue it, I would say that I'm not applying cases such as Hogan, then I'm not required to enable that which hasn't been invented yet. You have to enable the full scope of the invention, though, don't you? But then we would never be able to use the word comprising. I never enable all the extra things I could add into a claim. I would never have a claim that was dominating the argument. That isn't true. Would you be precluded from arguing enablement at this point? Since you did not appeal that to the Patent Board? I did appeal it to the Patent Board. They declined to reach a decision on it because they felt written description was dispositive. So can you go back now and re-argue that particular point? I believe so. I think they would then have to reopen. If you remand, you would have to remand for them to consider that issue and either to make another rejection or... I don't know that I can appeal a decision that they choose not to reach. From a procedural point of view, I don't know why they chose not to reach it. I'm sorry. But I do know that in many cases when we see written description rejections and they are hand-in-glove with an enablement rejection. And it's an interesting problem because I can indulge in science fiction a lot in a patent application when I'm drafting it. I can say, oh yes, well, we could do this and we could do that and we could do this. We've rejected pretty much those prophetic examples, haven't we? Well, yes, and that's why I try not to do it. Unless, of course, to deal with the point that you made earlier, I wouldn't be able to claim anything. No, you'd have to show a scientific principle that would support the understanding of one of skill in the art as to how to make and use the claimed invention within its entire scope. You wouldn't have to disclose everything. You'd have to disclose the scientific principles, though, that would enable. True, but I can, for example, in a case like this, I could say, okay, well, what would we want to do to make a small molecule? First of all, we would want to find, or an antibody, we'd want to find the business part of this thing, so we would chop it up and test it and we would do all sorts of things. That's the N. Ray Wright case. And that would not be enabling. Exactly, that's N. Ray Wright. That's right, and if I put that in and indulge in that kind of science fiction, then the examiner would come back and tell me that I wasn't enabling the full scope. Because that is... Because I haven't invented that part yet. Because it is science fiction. If, however, you can show the principles cognizable by one of skill in the art that would enable, you'll be fine. Except that at this point, my inventors have a broad conception and they have a specific implementation, and if you apply cases like Hogan to say, well, what they made was the crystalline form of the polymer and it was perfectly okay to claim polymer, even though by the time the case got around to being decided, somebody had found the amorphous form and it was a whole lot more valuable. And it couldn't be made by the method that was disclosed. And the court specifically said that I'm not required to enable every future invention. And when I think about kind of the classic case that we sometimes talk about when we're explaining dominating patents is, you know, it's the myth of the black and white TV inventor whose patent attorney is good enough to draw claims that say a box with an antenna and he never mentions that the image is... Why isn't the patent office correct in limiting your invention to just inhibiting gene expression of IgFBP5? Just that you found the one of the six IgBFBPs that works. Oh, no, the claims are limited to five. The claim, the issue is not whether we want to inhibit a different one. In fact, we wouldn't because of those group of proteins, and some of them you want to push up and some of them you want to push down. What the issue is, is should we be limited to oligonucleotide therapeutics versus therapeutics generally? That when somebody comes along and gets an antibody that targets IgFBP5. But it's the technology of limiting those IgGFBPs that's the question. The specific kind of drug you would use to do that, the patent office says we should be happy to have oligonucleotides when anyone who would infringe our claim would be using the very essence of our invention. That is that this protein is a good protein to target in combination with androgen reduction. Do you want to say your rebuttal? Yes, please. Mr. Walsh. Thank you, Your Honor. May it please the Court. In order to show that a claim is not supported by an adequate written description, it's necessary... What does that mean, support? It means that if people of skill in the art would understand the inventor had possession of the invention and claim... What's possession mean? It means that they have actually made this kind of invention. They don't have to actually reduce it to practice, but they actually have the invention that in this case would be effective to inhibit the expression of a particular protein. In the context of this art, the inhibition of one protein's expression means that the inventors have managed to interfere with the way that protein is produced. Ordinarily, a protein is produced by a cell after a piece of nucleic acid that codes for that protein is produced. It's called a messenger. In the general field of antisense technology, one of the ways in which you can slow down or inhibit or stop the expression of that protein is to interfere with that message. So an antisense molecule can be used because it has the opposite code. That's what the whole patent goes into. I understand that. But they ask for a method of inhibiting this particular protein. Well, I disagree with Ms. Larson's characterization of a claim as being that. Because if that were all that... A method for delaying progression of tumors, blah, blah, blah, comprising. Yes. And then we go into the antisense, etc., which limits expression. I think the important phrase is a composition effective to inhibit expression. Because what expression means is the production of the protein by nucleic acid machinery and other molecules. It doesn't just mean we're going to inhibit this protein by giving, say, an antibody that might attack that protein or slow it down. It means instead that we're interfering with the genetic mechanism of the cell. And in the state of the art, at the time this invention was made, the way to do that is with antisense technology. So, yes, the inventors say we use antisense because that's what works. Our question was... Let's use a hypothetical for a second. Let's assume that I discover that a certain factor in a blood test predicts with 100% efficiency breast cancer. I just take a simple blood test. Every time it will give me blood cancer. Can I have a patent on the method of detecting blood cancer through that means? Yes. If you specify the means, then usually you get a patent. What about if... What if I say a method of, not saying now blood testing or anything, just a method of detecting that relationship between those, whatever shows up in the blood. If I get a number five or greater, I know that it's a breast cancer. Now I'm not going to use a blood test. I'm just going to detect that same relationship by some other means. Well, if some means is disclosed, the basic problem is... Okay, I disclosed the blood test means, but now somebody else has found a way of doing it by shining light through the finger. They can detect very quickly whether I have that relationship over five and whether I have breast cancer. Then they may also be able to get a patent for that. No, no, no, no. Why can't they get it from the first one? Oh, I'm sorry. I misunderstood the question. Yeah, the first point is they've requested a method of detecting this relationship and all they've disclosed in their patent is a blood test. Do they also get something that goes beyond that blood test, shining light through a finger? Oh, it might depend on whether there's only one way to do the thing or not. They may have trouble getting a broader... No, the question is have they given adequate written description support? The method of detecting this relationship that discloses breast cancer. They might be able to get that. Why isn't that this case? Because in this case the claim requires... They've detected a certain relationship, something that you have to inhibit, and they've said we want the method of inhibiting that gene expression. They've given you one way of doing it, anti-sense technology. Why don't they get the rest? Because as far as we can tell it's the only thing that they've actually invented. They haven't gone beyond... Well, that's the only thing the first guy had invented. In my example the only thing he'd really invented was taking blood out of a finger and analyzing it. But actually what he'd invented was that relationship. He'd discovered that relationship that detects breast cancer. Usually when you discover a relationship you can get a patent if you can apply the new information in some specific way. He did, but now does he get other ways? I'm sorry? Has he provided enough written description support for other ways of doing it? And you said to me, yes, probably has. Why isn't that this case? I understood the question as being, has he provided written description support for doing that? And the answer is yes. He specified a means to do it. And if he claims that means certainly. If he just claims doing it, maybe not. The problem here is what has to be accomplished is to inhibit the expression of this particular gene. And the only way to do that that we can tell of is the one that's disclosed here. Are there other ways of doing it? Not on this record. Looking at the state of the prior art, the only way to do that kind of thing is to actually use antisense type molecules. In the examiner's findings, the examiner had identified that as being the specific difficulty because the examiner explained that... Yes, but see this person has made a contribution to the art. They've said here, look at this. This is what you've got to work on. And I'll give you one way to work on it. Use antisense technology. But now all the scientists in the world know that's the secret to inhibiting cancer growth. They all find a different method. Aren't they standing on the shoulders of the first person? Shouldn't they receive, shouldn't he receive some royalties, some benefit from that? Certainly this claim, the claims that are not rejected, the ones that use antisense... We're not talking about that. We all know that. We're talking about the person who comes along later and finds a way to do it using something other than antisense technology. Well, they don't get to dominate the discovery... Not dominating. There's going to be blocking patents. We all understand how this works. Well, they don't get to claim the discovery that they made in those broad terms. In order to get a patent, they have to reduce or apply the facts that they found or the discovery they made in some kind of method. And so their discovery is essentially useless because somebody's going to come up within two weeks and find a better way to do it. But what they did is show everybody that's where you have to focus your efforts. Well, if someone discovers a way of inhibiting the gene expression other than antisense, that's probably going to be a big breakthrough on its own because this particular field of inhibiting gene expression... That'll be after a rising technology which will be entitled to full protection when that occurs. And there'll be blocking patents. But why didn't the first inventor who identified the relationship and focused everybody on the right place deserve credit? Well, first, the inventor didn't invent the relationship. Certainly not. The inventor has invented a way of using that information. But what a tremendous contribution to the useful arts. He's going to save everybody from dying of breast cancer. Well, that is a good contribution, but the patent system only provides this kind of reward for the work and the disclosure, and other people are free to try and invent around what the inventor has contributed. So yes, they do get a patent on inhibiting the expression of this gene, but they don't get to cover the whole discovery or the underlying discovery. That is what the patent office has argued. Not sure I know why it makes sense. Can you explain to me why it makes sense that the tremendous contribution of this person who discovered the relationship and saved everybody's lives by focusing all research on that doesn't deserve protection? Well, because they get protection for their invention. Well, but they discerned that relationship. They invented the proper place to treat breast cancer. Well, what they have invented is actually just this one way of reaching in to control that one gene. You don't want to give anybody an incentive to discover these relationships. Well, I think the incentive is that they do get a patent that's very useful, and the incentive to continue work in this area is that other people who will explore inhibiting gene expression will still be incented to continue trying to develop other treatments. That's true under any... We all agree with that, of course. Anyone who comes up with a new composition will get a new composition claim. We're talking about a method of treatment claim here, and a method of treatment is what I've invented. A method of treating breast cancer by identifying this relationship. And you're saying that doesn't get anything. Well, we're not saying it doesn't get anything. It just gets the only thing that I can show. Yeah, the one thing that I can show. But that's not what I invented. I invented the method of treating breast cancer by that... Yeah, I think our position is that what they invented was a way of inhibiting that particular gene expression by using molecules like this one, anti-sense technology. Mr. Walsh, is it really the issue as to the fact that any composition which would inhibit under those claims would be infringing those particular claims? So you're really looking at any composition, no matter what it is. Yes. And they've only identified two transcripts. Well, yes, they identified the two target molecules, but they really could use any anti-sense molecules that would actually target those. In that long transcript, if you take the long transcript of some thousands of nucleotides long, various bits or sections of it can be targeted just by encoding the opposite strand. Opposite strand, right. Those anti-sense-type molecules would be evident from the long-term transcript. Some of them are effective than others probably, but they're all there in the initial transcript. But are they identifying each one or just several of the two? Well, they used a few examples. What the board found when it looked at it is it did not see why those few examples weren't representative of any kind of anti-sense molecules that anybody in this art would see when they looked at the full-length transcripts. In addition, the board was not persuaded that those two transcripts that were known weren't representative of transcripts from the other organisms. Besides, I think they had the mouse and the human. And the human. Yes. So beyond those two, then, what else is there? Well, I think what the board is thinking is that the claim should not be limited to just those two because they're probably representative of others, other animals in which someone might want to use this type of treatment. So based on the board's theory, then only those two transcripts would be available? No, I think the board's theory was that other transcripts probably are available. The board reversed the examiner's rejection of the claims. I think the examiner had said only two claims would be allowed because they had two specific examples. The board found that was not appropriate and that they didn't see evidence that people of skill and sort wouldn't give the offenders credit for many other anti-sense molecules. So they allowed, beyond the two claims that the examiner allowed, more along the basis of the two transcripts which were disclosed? Yes. All right. Thank you. Ms. Larson? The issue here is really, I think we've looked at it quite carefully, someday somebody may come up with another way to accomplish the function that the anti-sense does in this case. We don't know if that's going to happen and if we do, we don't know if it will happen during the term of this patent. Right now, that seems to be where the energy is focused, but if that does occur... Is this the case you want? You're looking for a case that contests the validity of the wholly undefinable written description doctrine, but is this the case? Because he didn't seem to invent anything other than an inhibition of IDGBFP5, period. I mean, this could be easily seen as just, let's define the invention, let's look at the specification, what did he invent, and boy, didn't he... And that's what we're asking for. But my little hypothetical up here was a little bit more elaborate than what you've given a justification for, isn't it? I don't think so. I think that what we have... It would be very different if we were asking for a claim that said any composition that you ever invent that's going to inhibit IGFBP5 expression. But that's not what we're asking. We are asking for the invention embodiment of the ability to apply this therapeutic method. If it's not important, if there's other ways to do it, then use those other ways. To invent your claim, you have to use what my inventor contributed. Excuse me, but isn't that really the terms of the claim? The language of the claim says, any composition effective to inhibit expression of IGFB5. But it's a method claim.  when it is used to treat an individual with a hormone-responsive cancer in a combination with cancer withdrawal. But it's still any composition. Right. So that right now there are no other compositions. There's a reason there's none in the record. It really would be after invented technology. We can guess, we can think about ways we might do it, but it is, in fact, science fiction. We don't have any other ways, and we do not know anyone who has any other way to do it right now. But we do know that if that technology breakthrough comes along, and if this is important enough, that in the next 20 years, this is a choice that somebody makes to do the first technology, that they will be standing, in Deterrator's words, they will be standing on my inventor's shoulders. Thank you. Okay, just a minute.